**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Norman A. GIGAX, Defendant-Appellant.**

**No. 78–1333.**

United States Court of Appeals,
Tenth Circuit.

Submitted May 17, 1979.

Decided Aug. 13, 1979.

Rehearing Denied Sept. 19, 1979.

508

Joseph F. Dolan, U. S. Atty., Denver, Colo. (James E. Nesland, Asst. U. S. Atty., Denver, Colo., on brief), for plaintiff-appellee.

Arnold C. Wegher, Denver, Colo. (Gary H. Tobey, Denver, Colo., on brief), for defendant-appellant.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Norman A. Gigax (Gigax) appeals his jury conviction of wilfully making false and

fraudulent statements in a Form W–4 Employee's Withholding Allowance Certificate by claiming 21 allowances and exemptions in violation of 26 U.S.C. § 7205.

Gigax was charged in a one-count information filed January 10, 1978. After various pre-trial motions, he proceeded to trial on February 21, 1978. He was found guilty on February 22, 1978.

Gigax does not contest the sufficiency of the evidence underlying his conviction. Rather, he claims the district court erred in (1) failing to recuse himself, *sua sponte*; (2) failing to declare a mistrial based upon conversations between third persons and jurors; (3) failing to appoint, *sua sponte*, "standby" counsel to assist Gigax in his defense; (4) failing to grant Gigax's motion for continuance; and (5) improperly assessing the impact of certain alleged prejudicial publicity.

### I.

Gigax contends that "the trial court was so personally prejudiced against the 'tax protestors' in general and the Defendant specifically that he should have recused himself." [Brief of Appellant, p. 17.]

The Supreme Court in *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), stated:

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. . . . Circumstances and relationships must be considered. This Court has said, however, that '[e]very procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused, denies the latter due process of law.' (Citation.) Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' (Citation.)

349 U.S., p. 136, 75 S.Ct., p. 625.

Citing *Murchison*, the court in *United States v. Brown*, 539 F.2d 467 (5th Cir. 1976) stated:

The truth pronounced by Justinian more than a thousand years ago that, 'Impartiality is the life of justice,' is just as valid today as it was then. Impartiality finds no room for bias or prejudice. It countenances no unfairness and upholds no miscarriage of justice. Bias and prejudice can deflect the course of justice and affect the measure of its judgments. If the judge finds himself possessed of those sentiments, he should recuse himself; or, if he does not, confront the likelihood of proceedings under the statute [5] [28 U.S.C. § 144] to require him to do so. (Footnote omitted.)

539 F.2d, p. 469.

*See also: United States v. Haldeman*, 181 U.S.App.D.C. 254, 559 F.2d 31 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Rapp v. Van Dusen*, 350 F.2d 806 (3d Cir. 1965); *Knapp v. Kinsey*, 232 F.2d 458 (6th Cir. 1956), *cert. denied*, 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956).

Thus, if a judge's conduct or appearance in the trial of a case does not comport with the appearance of justice, the conviction must be reversed. *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921); *United States v. Brown*, *supra*, at 470. Nonetheless, charges of misconduct or prejudice leveled at trial judges "should not be lightly made and, once made, should not be casually treated by a reviewing court." *United States v. Cardall*, 550 F.2d 604, 606 (10th Cir. 1976), *cert. denied*, 434 U.S. 841, 98 S.Ct. 137, 54 L.Ed.2d 105 (1977).

Mandatory disqualification of a federal judge to preside over a particular case may be premised on either of two statutes—28 U.S.C. §§ 144 or 455. Section 144 provides as follows:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

■ Under § 144, a motion to recuse must be filed promptly after the facts forming the basis of the disqualification become known. *Davis v. Cities Service Oil Company*, 420 F.2d 1278 (10th Cir. 1970). The motion must be accompanied by an affidavit stating, in non-conclusory terms, the facts establishing the alleged personal prejudice, stemming from an extra-judicial source and resulting in an opinion on the merits other than that which the judge has learned through his participation in the case. *United States v. Grinnell Corporation*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Ritter*, 540 F.2d 459 (10th Cir. 1976), *cert. denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976). The challenged judge determines the sufficiency of the affidavit but does not weigh or test the truth of the allegations. *United States v. Ritter, supra*. If the facts "give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment" [*Berger v. United States, supra*, 255 U.S. 33–34, 41 S.Ct. 233] the judge must recuse even though the statements may not accurately reflect the judge's state of mind. *Bell v. Chandler*, 569 F.2d 556 (10th Cir. 1978). The mere fact that a judge has made an adverse ruling during trial; accepted the guilty plea of a coconspirator, or has had prior judicial contact with the de-

fendant does not establish prejudice or bias. *United States v. Baker*, 441 F.Supp. 612 (M.D.Tenn.1977).

Section 455, on the other hand, requires that a judge disqualify or recuse himself where "his impartiality might reasonably be questioned."

The office of the procedure under § 144 is to disqualify a judge prior to trial on motion of a party. Section 455 is the statutory standard for disqualification of a judge.[11] *It is self-enforcing on the part of the judge. It may also be asserted by a party by motion in the trial court, Rapp v. Van Dusen*, 3 Cir., 1965, 350 F.2d 806, 809; *through assignment of error on appeal, United States v. Seiffert*, 5 Cir., 1974, 501 F.2d 974; *Shadid v. Oklahoma City*, 10 Cir., 1974, 494 F.2d 1267, 1268, by *interlocutory appeal, as here, or by mandamus, Texaco, Inc. v. Chandler*, 10 Cir. 1965, 354 F.2d 655. (Footnote omitted.) (Emphasis supplied.)

*Davis v. Board of School Commissioners*, 517 F.2d 1044, 1051, (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

■ In determining whether a judge should recuse under § 455(a), the issue is not whether the judge is impartial in fact, but rather, whether a reasonable man might question his impartiality under all circumstances. *United States v. Ritter, supra; Rice v. McKenzie*, 581 F.2d 1114 (4th Cir. 1978); *SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir. 1977).

Congress enacted the revision to make the statute conform to the Code of Judicial Conduct, 119 Cong.Rec. 33029 (1973) (remarks of Senator Burdick) as well as to "broaden and clarify the grounds for disqualification," 119 Cong.Rec. 33029 (1973), and to substitute an objective test of reasonableness for the subjective test of the former Section 455. Under the broader standard of revised Section 455(a), disqualification is appropriate not only where there is actual or apparent bias or prejudice, but also when the circumstances are such that the judge's "im-

partiality might be reasonably questioned." *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction, Section 3549.

*United States v. Ritter*, 540 F.2d, p. 462.

In *SCA Services, Inc. v. Morgan, supra*, the Seventh Circuit discussed the new "objective" standard noting the practical difficulties encountered in its application:

> . . . Although the statute enunciates the appearance of partiality as the general standard for judicial recusal and the legislative history suggests that this standard is determined by reference to the reasonable person,[18] no factual or concrete examples of the appearance of impartiality were provided in the Congressional debates. Moreover, because a judge must apply the standard both as its interpreter and its object, the general standard is even more difficult to define. . . . (Footnote omitted.)

557 F.2d at p. 116.

Despite the lack of guidance provided by Congress, certain parameters can be drawn through an examination of the case law. Recusal was mandated in the following cases. *United States v. Brown, supra*, (Judge stated to individual at a bar association meeting prior to Brown's trial "that he was going to get that nigger."); *Texaco, Inc. v. Chandler*, 354 F.2d 655 (10th Cir. 1965) (sitting *en banc*), *cert. denied*, 383 U.S. 936, 86 S.Ct. 1066, 15 L.Ed.2d 853 (1966) (Where an attorney represented the judge in a civil damage action, and also represented the plaintiff in a suit against an oil company which was before the judge's court, the judge's connection with the attorney for the plaintiff required recusal.); but not in the following instances: *United States v. Bray*, 546 F.2d 851 (10th Cir. 1976) (Defendant's affidavit alleged that he had gathered 2,000 signatures of persons desiring removal of the judge assigned to the case, written an article calling for the judge's impeachment, sent a protest telegram to the judge, and filed a brief with the court accusing the judge of bribery, conspiracy and obstruction of justice.); *United States v. Haldeman, supra*, (Allega-

tion that extensive press and media coverage of judge's activities so inextricably intertwined him with the prosecution of the case in question was insufficient to require recusal.); *Parrish v. Board of Commissioners of Alabama State Bar*, 524 F.2d 98 (5th Cir. 1975) (sitting *en banc*), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976) (Judge could properly preside over lawsuit in which a black plaintiff claimed discrimination in the administration of the state bar examination despite the fact that judge was the president of a local county bar association which barred blacks from its membership; was acquainted with several of the defendants and all defense counsel; and stated that he did not believe any of the defendants he knew would intentionally misrepresent any matters in the lawsuit.); *Lawton v. Tarr*, 327 F.Supp. 670 (E.D.N.C. 1971) (Federal judge who was vehemently opposed to VietNam war and expressed his beliefs publicly could properly decide merits of a case involving the Selective Service Act.).

Inasmuch as "the grounds for disqualification set out in Section 144—'personal bias or prejudice either against [a party] or in favor of any adverse party'—are included in Section 455," *United States v. Ritter, supra*, 462, we may consider both sections together.

Thus, with the parameters outlined above in mind, our task is to determine whether a reasonable person would have questioned the district judge's impartiality.

We have carefully reviewed the record of the trial in this matter. We discern no actions on the part of the district judge which would indicate circumstances where his "impartiality might be reasonably questioned." *See:* 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction, § 3549. Similarly, counsel on appeal has not pointed to any circumstances *in the trial itself*, which indicate bias or even the appearance of bias on behalf of the district judge who tried this case. Rather, Gigax points to certain comments made by the judge during the sentencing hearing and the hearing on his application for bond on appeal.

With regard to the trial judge's comments at sentencing, Gigax asserts that the following statements undeniably show such extreme prejudice as to require recusal: (1) the court asked the Government to "make a statement . . . as to [its] views of the case" prior to imposition of sentence [R., Vol. IV, p. 6]; (2) the court voiced concern and considered Gigax's active involvement in the tax protest movement [R., Vol. IV, p. 10]; (3) the court considered the fact that Gigax taught a class in the United States Constitution at the Tax Strike Information Center and characterized "his conduct [in this regard as] designed to foment disruption in this country" [R., Vol. IV, p. 11]; and (4) the court considered the fact that Gigax, as a government employee, received most, if not all, of his salary "from the very taxes paid by others that he refuses to pay." [R., Vol. IV, p. 12.]

■ Following the same theme, Gigax asserts that the following remarks made at the hearing on his application for bond on appeal demonstrated actual bias on the part of the trial judge:

. . . [T]he trial judge stated that he was making an example of the Defendant and that he was going to convince people to quit putting stickers all over the Courthouse. The Court openly stated that he did not think that people who defy the tax laws were going to get very friendly reception in this Court; and, if he hadn't gotten his income tax return from his accountants the day before to sign he probably wouldn't be as mad as he was that day, but having received that he really thought everybody ought to pay their taxes.

[Brief of Appellants, p. 18.] See also: R. Vol. V, pp. 35, 36, 37.

Turning to an analysis of the remarks made at the sentencing hearing, initially we believe it is important to note that "[o]ur criminal justice system recognizes that a sentencing judge has considerable leeway and discretion in determining, from the totality of the circumstances, the extent of the individual punishment to be meted out." *United States v. Baer,* 575 F.2d 1295, 1299 (10th Cir. 1978). In determining the type and length of sentence to be imposed, after a conviction, the sentencing judge must consider all of the mitigating and aggravating circumstances relevant to the sentencing process. *Williams v. Oklahoma,* 358 U.S. 576, 585, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959). In *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the Supreme Court observed that "[h]ighly relevant—if not essential—to [a sentencing judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.[1] And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge . . . [have the] . . . opportunity to obtain pertinent information[1] . . . . (Footnotes omitted.) *Williams v. New York, supra,* at 247, 69 S.Ct. at 1083. The "prevalent modern philosophy of penology [is] that the punishment should fit the offender and not merely the crime." *Williams v. New York, supra,* at 247, 69 S.Ct. at 1083. Sentences should be determined with an eye toward "[r]eformation and rehabilitation of offenders." *Williams v. New York, supra,* at 247, 248, 69 S.Ct. 1079. "[B]efore making [the sentencing] determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). *See also: United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978).

Gigax contends that the district judge's bias and prejudice against him was shown at the sentencing hearing in that he "invited matters in aggravation from the prosecutor and lumped defendant together with his 'co-horts' in a blanket reaction to all of the 'tax protestors' rather than dealing with the defendant's case alone." [Brief of Appellant at p. 18.]

■ Fed.Rules Cr.Proc. rule 32(a) 18 U.S.C.A., provides that "[t]he attorney for the government [is allowed] an equivalent

opportunity to speak to the court [concerning imposition of sentence]." Similarly, the fact that the court considered Gigax's active participation in an organized effort to violate the law was proper. "Punishment serves several purposes: retributive, rehabilitative, deterrent—and preventive." *United States v. Brown,* 381 U.S. 437, 458, 85 S.Ct. 1707, 1720, 14 L.Ed.2d 484 (1965). The sentencing considerations enunciated in this case clearly fall within the confines of those purposes.

We have previously noted Gigax's concern relative to certain remarks made by the trial judge during the hearing on his application for bond on appeal. Rule 9 of the Federal Rules of Appellate Procedure, 28 U.S.C., provides that the "decision as to release pending appeal shall be in accordance with Title 18 U.S.C. § 3148." Section 3148, in turn, refers to § 3146. Section 3146(b) sets certain factors which may be considered initially by the district court in fixing the amount of the appeal bond. Among the factors are "the nature and circumstances of the offense charged, the weight of the evidence against the accused, the accused's family ties, employment, financial resources, character and mental condition, the length of his residence in the community, his record of convictions, and his record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings." 18 U.S.C. § 3146(b).

A decision as to bail made by the district court is entitled to "great deference." *Harris v. United States,* 404 U.S. 1232, 92 S.Ct. 10, 30 L.Ed.2d 25 (1971) (Douglas, J., in chambers). *See also: Mecom v. United States,* 434 U.S. 1340, 98 S.Ct. 19, 54 L.Ed.2d 49 (1977) (Powell, J., in chambers). Reviewing the transcript of the court's hearing on Gigax's application for bond on appeal, we find no error. While there are passing references by the judge as to his belief that it is improper for individuals to disobey the income tax laws, " '[a] judge cannot be disqualified because he believes in upholding the law, even though he says so with vehemence.' " *United States*

*v. Haldeman, supra,* 181 U.S.App.D.C. p. 134, n. 302, 559 F.2d p. 134 n. 302 (quoting from *Knapp v. Kinsey, supra* ).

In summary, our review of the record demonstrates that the district judge conducted the trial proper in a fair and impartial manner. He did freely express his opinions at the hearings on imposition of sentence and the defendant's application for bail pending appeal. Those opinions, in and of themselves, did not require recusal. The issue of disqualification "is a sensitive question of assessing all the facts and circumstances in order to determine whether the failure to disqualify was an abuse of sound judicial discretion." House Rep. No. 93–1453, *reprinted* [1974] U.S.Code Cong. and Admin.News, pp. 6351, 6355. We hold that there was no abuse of judicial discretion in this instance.

### II.

Gigax asserts that the district court erred in its handling of outside communications with jurors during the pendency of the action.

The first incident complained of occurred on the first day of trial during a recess in the proceedings. During this recess, the jury was allowed to go to a small snack bar in the courthouse for refreshments. Certain other participants in the trial also retired to the snack bar during the recess.

One of the principal witnesses in the trial, Steven L. Phillips, a certified public accountant working for the Internal Revenue Service, was having coffee in the snack bar with IRS Agent Mike Smith. After finishing his coffee, Phillips left the snack bar and proceeded to an elevator. Shortly after entering the elevator, a woman joined him. While in the elevator, the woman stated to Phillips, "It's tough being on the stand." Phillips replied, "Yes, I'm quite nervous." to which she said, "Yes, I've testified before." She then related "some story about someone losing her hair." [R., Vol. II, p. 166.]

Following Phillips' testimony as to these facts, the district judge, at the request of

Gigax, declared a mistrial based upon witness-juror contact. [R. Vol. II, p. 168.] Shortly thereafter, however, Gigax informed the court that he didn't believe "any good interests would be served by declaring a mistrial at this time" [R., Vol. II, p. 170] and requested that his motion for mistrial be withdrawn. The court granted the motion and trial continued. [R., Vol. II, p. 170.]

Gigax now complains that the trial court's granting of his request to withdraw his motion for mistrial constituted plain error. We do not agree. The record clearly shows that his decision to withdraw his motion was voluntarily and knowingly made. [R., Vol. II, p. 170.]

The second instance of outside juror contact presents more difficult questions. Apparently without Gigax's knowledge, the person taking notes for Gigax at the trial, Tim Z. Ogle, indirectly contacted a juror by the name of Colleen Hansen through a fellow employee of Hansen and attempted to influence her by providing her with a "Handbook for Jurors." The "Handbook" states, in essence, that a jury has an absolute right to acquit an accused even if it means disregarding the instructions on the law given by the trial judge.

Gigax asserts that the district judge improperly handled this second incident of jury tampering by failing to (1) give notice to Gigax of the facts as he understood them; (2) require the Government to establish, at a hearing in which Gigax was allowed the right of cross-examination, that such contact was harmless to the defendant; (3) make findings with adequate specificity for meaningful appellate review; and (4) declare a mistrial based upon the outside communication.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial by an *impartial jury* . . . ." (Emphasis supplied.) In *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) [Remmer I] the Supreme Court stated:

In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. [Citations.] . . . The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate. . .

347 U.S., at p. 229, 74 S.Ct., at p. 451.

*See also: Ellis v. State of Oklahoma,* 430 F.2d 1352 (10th Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971); *United States v. Moten,* 582 F.2d 654 (2d Cir. 1978); *United States v. Boscia,* 573 F.2d 827 (3rd Cir. 1978), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978).

In *Ellis v. State of Oklahoma, supra,* we stated:

It is a heavy and difficult burden [to rebut the presumption of prejudice], the satisfaction of which the appellant [Ellis] will probably always doubt because an acquittal was not obtained. But that is not the test. Surmise and suspicion may not be used to assail the integrity of a jury; it is presumed that jurors will be true to their oath and will conscientiously observe the instructions and admonitions of the court. *Baker v. Hudspeth,* 129 F.2d 779 (10th Cir. 1942).

To prevent even the possibility of an impairment of the defendant's constitutional rights, we would momentarily digress to suggest to all trial courts of this

Circuit, that when a question arises during the trial as to the ability of a juror to continue to serve, the defendant be given actual notice of any discussion to be held on the matter.[7] (Footnote omitted.) 430 F.2d, p. 1356.

 Despite these strong admonitions, it is well settled that the failure to provide a full evidentiary hearing into possible prejudice resulting from communications with jurors does not automatically require reversal or remand. *See : United States v. Boscia, supra*, at 831. In our view, where a record is available for meaningful appellate review concerning the circumstances of the outside juror contact, the type of information relayed, the impact thereof upon the juror, and whether or not it affected the jurors' deliberations, we may independently review that record to determine whether reversal is mandated. Such a record is available in this case.

 Following the attempted "jury tampering," Ogle was indicted and brought to trial for his participation in the "tampering" scheme. *See : United States v. Tim Z. Ogle*, 78–CR–148 (D.Colo.). During the proceedings in that case, Colleen Hansen, the juror contacted in the instant case, testified in detail as to the circumstances and her state of mind concerning the outside communication. Our review of Hansen's testimony in the *Ogle* trial leads us to conclude that the contact was not prejudicial and did not affect Hansen's independent deliberations with regard to the verdict rendered in the case at bar. *See :* Appendix A. Accordingly, we hold that the failure to notify the defendant of the conduct and to hold a hearing in which all parties were present, constituted harmless error. *See : Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### III.

As his third allegation of error, Gigax contends that he was entitled to "standby" counsel to aid him in his *pro se* defense at the trial level. This is so, he argues, because he personally was "not competent, effective counsel for himself in that he lacked formal legal education, training and experience which would have enabled him to defend himself." [Brief of Appellant, at p. 7.]

In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) the Supreme Court held that the Sixth Amendment does not merely provide that a defense shall be made for an accused, but grants to an accused the right to personally conduct his own defense, whatever the extent of his technical legal knowledge. The record must show, however, that the accused's election of self-representation resulted from a voluntary exercise of his informed free will · with knowledge of the consequences thereof.

Gigax does not contest the validity of his waiver of right to counsel, or the fact that the district court offered to appoint counsel to represent him. [Brief of Appellant, at p. 8.] Rather, he contends that his demonstrated "inability to carry out this representation, . . . was plain error [in the absence of] at least standby counsel . . ." [Brief of Appellant, at p. 8.] In *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532, Chief Justice Burger, concurring in the opinion of the Court, stated:

. . . When a defendant refuses counsel, as he did here, or seeks to discharge him, a trial judge is well advised—as so many do—to have . . . "standby counsel" to perform all the services a trained advocate would perform ordinarily by examination and cross-examination of witnesses, objecting to evidence and making closing argument. No circumstance that comes to mind allows an accused to interfere with the absolute right of the trial judge to have such "stand by counsel" to protect the rights of accused persons "foolishly trying to defend themselves," as Mr. Justice Douglas so aptly described it. In every trial there is more at stake than just the interests of the accused; the integrity of the process warrants a *trial judge's exercising his discretion* to have counsel participate in the defense even when rejected. A criminal trial is not a private matter;

the public interest is so great that the presence and participation of counsel, even when opposed by the accused, is warranted in order to vindicate the process itself. (Emphasis Supplied.)

400 U.S., at p. 467, 468, 91 S.Ct., at p. 506.

■ Even in situations where the accused may have to be removed from the courtroom because of obstructive conduct, Chief Justice Burger, in the strong language found in his concurrence in *Mayberry, supra*, suggests that the appointment of "standby counsel" is within the discretion of the trial judge. We concur with his views.

28 U.S.C. § 1654 provides that "parties may plead and conduct their own cases personally *or* by counsel . . . ." Various courts considering this issue "have consistently interpreted this statute as stating a defendant's rights in the disjunctive." *United States v. Daniels*, 572 F.2d 535 (5th Cir. 1978) and cases cited therein. In *United States v. Hill*, 526 F.2d 1019 (10th Cir. 1975), *cert. denied*, 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976), we stated:

> The Sixth Amendment does not give any indication that hybrid representation [right of self representation with appointment of counsel] is a right of constitutional dimensions. . . . [N]o statutory right of hybrid representation is accorded. Finally, . . . we cannot say the trial court abused its discretion in denying hybrid representation in this case.

526 F.2d, at 1025.

*See also*: *United States v. Pinkey*, 548 F.2d 305 (10th Cir. 1977).

■ Inasmuch as the appointment of "standby counsel" is within the broad discretion of the trial court, we hold that the district court did not commit error in failing to appoint such "standby counsel." In *United States v. Shea*, 508 F.2d 82 (5th Cir. 1975), *cert. denied*, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975), the court aptly stated:

It is not the function of an appellate court to consider the wisdom of [a defendant's decision to waive right to counsel]; it is our duty to make sure that the choice was knowingly, intelligently and voluntarily made. In this case, we feel that it was.[1]

508 F.2d, at p. 86.

### IV.

Gigax complains that he was denied adequate time for preparation because the Government failed to supply discovery material within seven days after the arraignment as required by the Local Rules of Practice for the United States District Court for the District of Colorado, and because of the District Court's refusal to grant a continuance of the trial date based upon the late disclosure.

■ We hold that Gigax's contentions in this regard are without merit. A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of that discretion. *Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); *United States v. Mason*, 440 F.2d 1293 (10th Cir. 1971), *cert. denied sub nom.*, *Edwards v. United States*, 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165 (1971).

■ Gigax's argument concerning prejudicial publicity is also without merit. The burden of establishing the existence of prejudicial publicity rests with the accused, when such publicity is not "inherently prejudicial or unusually extensive." *Gordon v. United States*, 438 F.2d 858 (5th Cir. 1971), *cert. denied*, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971). Gigax has not met this burden.

WE AFFIRM.

---

1. Gigax also argues that the court erred in denying his motion for lay counsel. We have consistently held that the Sixth Amendment does not afford an accused the right to be represented by lay counsel. *See, e. g., United States v. Irwin*, 561 F.2d 198 (10th Cir. 1978), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 725, 54 L.Ed.2d 755 (1978); *United States v. Afflerbach*, 547 F.2d 522 (10th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *United States v. Grismore*, 546 F.2d 844 (10th Cir. 1976).

**518**

## APPENDIX A

Q Did there come a time that evening that you received a call from Jackie Lagoni?

A Yes.

Q Do you recall approximately when it was that you received that telephone call?

A Around 8:30 or nine o'clock.

Q All right, and would you please tell the Court and jury to the best of your recollection what the conversation was between you and Jackie Lagoni, that is what she said and what you said?

\* \* \* \* \* \*

Q Please tell us to the best of your recollection what you said in that conversation over the telephone and what Jackie Lagoni said.

A Okay, she said, "Hello, this is Jackie."

Q Would you please speak up.

A She said, "Hello, Colleen, this is Jackie. I hear you are on a tax case." And I said, "How do you know that?"

And she said, "A little birdie told me," and then I said, "Oh, you must have talked to Tim," and she said, "Yes."

And I said, "I didn't know you—I didn't [know] you knew each other," and she said, "Yes, we are very good friends."

And then she said, "Would you mind if Tim dropped by a book this evening on juries and what the Court does not tell you," and I said, "No, I don't want Tim anywhere near the house."

Then she said, "Would you mind if I brought the book by?" And I said, "No, Jackie, I want to go with what the Court tells me."

And then she said, "Well, how is the case going," and I said, "You know, I can't talk about it." and then the conversation went on about work, and then that was it.

Q What conversation do you recall having with her about work?

A She said, "Hurry back, the flights are full and—"

Q Did that end the conversation?

A Right.

Q Did you have occasion on the following day to report that conversation to anyone?

A Yes, before court started the next morning, I stopped Judge Winner in the hallway and told him about it.

\* \* \* \* \* \*

Q Now, did there come a time after the trial concluded that you had occasion to receive a further call from Jackie Lagoni?

A Yes.

Q When was that?

A I believe it was on the 23rd or 24th. It was a few days later. I'm not sure exactly of the date.

Q All right.

A And she called and said, "All I want to know is did you tell someone about our phone conversation, and—or the phone call," and I said, "Yes, I told the Judge."

And she said, "Why?" And I said, "Jackie, I took an oath and you put me in a compromising position," and I asked her why she was calling, and she said, "Because the FBI is after me," and I said, "Just talk to them, Jackie," and that was all that was said.

\* \* \* \* \* \*

Q In that telephone conversation that you had with Jackie Lagoni on the night of February 21st, did Jackie Lagoni discuss, or did you and Jackie Lagoni discuss the Gigax trial?

A No.

Q Did Jackie Lagoni suggest to you how you should find in that case?

A No.

Q Did Jackie Lagoni suggest you should decide one way or the other?

A No.

Q Did Jackie Lagoni tell you, "Tim thinks you ought to decide this way or that way"?

A No.

Q Now, I believe you talked to Judge Winner, who was the presiding judge, the next morning?

A Yes, sir.

Q Do you recall approximately what time?

A It was probably about 8:30.

Q It was before—

A It was before court started.

Q —court started that day?

A Yes, sir.

Q Did Judge Winner declare a mistrial in that case?

A No.

Q Was any action taken immediately with respect to his conversation?

A Not that I know of, no.

Q When you talked to Jackie on the night of February 21st, did she attempt to persuade you to let her come by and drop off the pamphlet?

A She asked if she could.

Q And you said no?

A Right.

Q Did she follow up on that at all and say—

A No.

Q "Colleen, I sure would like for you to read this."

A No.

Q Did she put any pressure on you at all to let her bring by this pamphlet?

A No.

Q Have you ever seen the pamphlet that Jackie Lagoni was talking to you about?

A Have I read it? No.

Q So you don't know what's in it?

A No.

Q You don't know if it discusses any case in particular or just general principles of law?

A I have no idea.

Q Do you have any idea whether or not that book could have influenced your decision in that case?

A No.

\* \* \* \* \* \*

Did you previously receive instructions at the trial as to what you should do with respect to your duties as a juror in talking with anybody and reporting anything with respect to talks?

A Yes, I did.

Q All right, what instructions did you receive from Judge Winner on that?

A He informed us that if anyone tried to contact us regarding this trial that we should inform the Court immediately.

Q Now, how emphatic were you with respect to refusing to talk to Jackie Lagoni?

A I was very upset when she wanted—when she asked if Tim could come by.

Q And did you convey that to her?

A I believe so, yes.

[R., Vol. II, D.C. No. 78–CR–148, pp. 88, 89, 90, 91, 99, 100, 101, 102, 103.]