UNITED STATES of America, Plaintiff-Appellee,

v.

Franklin Andrew DAY, Charles Leroy Jones, and John Watie Bias, Defendants-Appellants.

Nos. 86–2313, 86–2430 and 86–2433.

United States Court of Appeals, Tenth Circuit.

Oct. 5, 1987.

Sheldon J. Sperling, Asst. U.S. Atty. (Roger Hilfiger, U.S. Atty., with him on briefs), Muskogee, Okl., for plaintiff-appellee.

S. Daniel George, Sallisaw, Okl., and Mark Green of Green and Green, Muskogee, Okl. (Bruce Green of Green and Green, Muskogee, Okl., Richard A. Pyle, Eufaula, Okl., with him on briefs), for defendants-appellants.

Before HOLLOWAY, Chief Judge, BARRETT, Circuit Judge, and CONWAY,[*] District Judge.

BARRETT, Circuit Judge.

The defendants, Day, Jones and Bias, appeal from a jury conviction, following a six-day trial, of charges of conspiracy, fraud by wire and mail, and interstate travel in aid of racketeering enterprises, all in violation of 18 U.S.C. §§ 2, 371, 1952, 1343 and 1341. The fraudulent scheme involved arson of defendant Day's home and its contents at Roland, Oklahoma, and the subsequent claim by Day for money through insurance policies issued against property losses resulting from the fire. Day collected some $90,000 from his insurance company on the losses about a year and one-half following the arson.

Day, a former prosecutor and city attorney, was practicing law at Roland, Oklahoma, in 1983, when hard times fell upon his practice and his marriage. Day borrowed $3,000 from one Sherman McKeehee, a Muldrow, Oklahoma, businessman, to be repaid in the amount of $6,000. At that time, Day was living in his law office. Thereafter, McKeehee pressed Day for repayment of the loan. In June of 1984, Day contacted one Ernie Vaughn, former Chief of Police of Roland, and a fifteen year law enforcement official, to arrange the arson of his (Day's) home. Vaughn, in turn, contacted one James Clark and by subsequent contacts defendants Jones and Bias joined the conspiracy. At the time of trial, Vaughn had pled guilty to charges arising out of the Day arson scheme and was serving a sentence. He testified at trial under a plea agreement. The same was true of witness Herman Wheeler. The defendants each testified in their own defense. Sherman McKeehee testified. He had not been charged by the government and no promises had been made to him by the government. The testimony conflicted sharply.

Day denied any contacts with anyone to commit arson or to defraud. Defendants Jones and Bias denied any connection with the arson. Sherman McKeehee, while denying any connection with the scheme, nevertheless testified that after he made the cash $3,000 loan to Day and while leaving Day's private office, he saw Ernie Vaughn in Day's waiting room and that Vaughn told him he would get his money back because he (Vaughn) was going to burn Day's home. (R., Vol. V, p. 436). McKeehee said that he made the loan on a two-for-one repayment basis on the recommendation of Vaughn, id. at 439, 440, and that Day had informed him that Ernie and

---

* Honorable John E. Conway, United States District Judge for the District of New Mexico, sitting by designation.

Pat Vaughn were "pressuring" Day to burn his home. *Id.* at 464, 465. Herman Wheeler, serving a sentence for the subject arson at the time of the trial in this case, testified under a plea agreement. *Id.* at 317. He stated that Day hired him, Ernie Vaughn and Mike Cleery, Chief of Police of Roland, to burn the Day home for $10,000 to be divided three ways. *Id.* at 292. Wheeler testified that McKeehee was afraid that Day wasn't going to burn his home and that he wasn't going to get his money back. *Id.* at 296. McKeehee was repaid by Day in the amount of $6,000 about a year and one-half after the loan was made and after Day had collected some $90,000 of insurance proceeds. In addition, Day repaid loans owing to Roland businessman, A.B. Wilson, in the amount of $7,500 from the insurance proceeds. (R., Vol. VII, pp. 1034–36).

This appeal does not challenge the sufficiency of the evidence. The sole issue presented is whether the trial court abused its discretion in denying appellants' motion for mistrial based upon improper jury contact involving a brief conversation which occurred during a trial recess in a restroom between the government's main investigator and witness, FBI Agent Harry Fender and a juror with whom he was acquainted. Before reaching this issue, we observe that our review of the entire trial record leads us to conclude that the evidence of guilt was overwhelming.

FBI Agent Fender was seated at the government counsel's table throughout the trial. Immediately before a tape recording was played to the jury, identified and admitted in evidence as Government's Exhibit No. 30, the court called a recess and instructed the jury not to discuss any matter with anyone or to make any independent investigations. (R., Vol. V, pp. 433, 444). During the short recess, Agent Fender proceeded to a restroom where several jurors and appellant Day were also present. One of the jurors, with whom Agent Fender was acquainted, made some comment to Agent Fender. Agent Fender testified that the following conversation occurred:

AGENT FENDER: Well, I said "How are you holding up?" He said, getting sleepy or something to that effect. And I said, "Well, this may put you to sleep," or something like that. (*Id.* at 445–46).

There is no dispute about the nature of the remarks. Appellant Day testified that he overheard the conversation, and his account of the conversation was very similar to that recalled by Agent Fender. (R., Vol. III, p. 13). Day reported this conversation to his attorney who in turn moved for a mistrial, joined by co-defendants Bias and Jones, based upon improper juror contact by Agent Fender. (R., Vol. V, p. 445). Thereafter, the trial court conducted a hearing on the motion for mistrial in the courtroom out of the hearing of the jury. After Agent Fender testified about his conversation with a juror, the following transpired:

THE COURT: Well, what in the world are you doing talking to a juror?

AGENT FENDER: Sir, when I first said something to him, I'm not sure I was aware that he was a juror. He made a comment to me.

THE COURT: Well, you have been sitting right there. You are facing the jury.

AGENT FENDER: Yes, sir.

THE COURT: You can look at the jury. You see them walk in and out of here, and you ought to know who's a juror. They got on juror buttons. I believe everyone of them has on a juror button.

AGENT FENDER: Yes, they do, sir. Obviously, I meant no malicious intent by this comment.

THE COURT: Well, did you mean to influence them by being nice to them and congenial, and that sort of thing? Just kind of pass—you said you were passing the time of day. I suppose that is what you would do with somebody you mean to be nice to.

AGENT FENDER: Your Honor, I guess I'm nice to everyone. But I wasn't trying to carry on a discussion. And I certainly wasn't trying to influence him in any way. And I really owe—

THE COURT: How long have you been an FBI agent?

AGENT FENDER: Seventeen and a half years, sir.

THE COURT: That is what I thought. That is the reason I can't imagine you doing it. I don't think there has been any harm here, but—

AGENT FENDER: Sir, I regret the—that it happened. I certainly meant no harm. I was not trying to influence any juror as to the outcome of this trial or do anything else malicious.

THE COURT: Well, I just don't—you just don't have any business having any conversation with any juror.

AGENT FENDER: Yes, sir.

THE COURT: About anything.

\* \* \* \* \* \*

THE COURT: I don't think there has been any harm. Any record you want to make? Thank you, sir. You can have a seat.

MR. GREEN (Counsel for Appellant Day): Your Honor, I move for a mistrial, the record is made. The harm is evidence just from the contact with the juror.

MR. PYLE (Counsel for Appellant Jones and Bias): Your Honor, I would renew the motion for mistrial because while Mr. Fender said he was well intended, or at least no intention of doing anything wrong, we don't know whether he has affected the thinking of that juror. We have specifically kept our clients and us away from the jurors, and yet Mr. Fender believes that he can walk in and pass the time of day and chit-chat with them. I think it is fundamentally wrong for the government to have done that, and with the experience he has got, he knows better than that. If I were to exchange a word with them, a juror out there, I would have been in trouble. And he knows that, too. Nobody knows whether he's influenced this jury or not, and we don't know that he wasn't intending to. He may have any way. I think we are entitled to have a mistrial granted.

THE COURT: Oh, I don't think so. He's repeated virtually verbatim what defendant Day says that there was. I don't see how that can be harmful at all. I just don't think the government is in any position, if their own tape puts him to sleep, any position to complain about it. *Id.*, pp. 446–48.

The tape recording, admitted as Government Exhibit No. 30, occurred in the office of Frank Sullivan, attorney for Sherman McKeehee. Present in addition to Sullivan, were Day and McKeehee. The recording occurred on May 27, 1986. Trial of the instant case commenced on July 17, 1986. Day had been indicted on the instant charges. McKeehee had not been charged or promised anything by the government (R., Vol. V, pp. 450–52). The trial testimony of Day and McKeehee does not contradict any statements made by either during the taped conversation. At trial, Day specifically testified that he had no dispute with the accuracy of the statements he made on the tape. (R., Vol. VII, pp. 904–05). We have listened to the tape, via earphones. At trial, it was played into an amplifying device so that it could be heard by the jury. This did not work out very satisfactorily, however. A juror remarked "I can't understand it" and the court responded "I can't either, I can't understand very much of it." (R., Vol. V, p. 450). The tape was then played without amplification, and the judge instructed the jury to disregard anything they could not understand. *Id.*

Appellants contend that Agent Fender's remarks to the juror involved the merits of the case and not a brief, casual, innocent exchange because he (Agent Fender), in relating to the juror that the next bit of evidence (the taped conversation) would probably put him to sleep was, in effect, stating that defendant-appellant Day was lying. Further, appellants contend that Agent Fender's comments indicated to the juror that he should not focus on defendant Day's taped remarks because they were not true. Appellant Day contends "Furthermore, that evidence [the tape] happened to consist of appellant's explanation of certain events relevant to this case." (Brief of Appellant Day, p. 10).

We observe that nothing in the taped conversation was inconsistent with the tes-

timony given at trial by Appellant Day or government witness Sherman McKeehee. Furthermore, nothing in the tape tended in any way to be exculpatory of Appellant Day's guilt of the charges with which he was confronted. Our review of the trial record, including a review of the taped conversation contained on Government Exhibit No. 30 and the trial testimony of Appellant Day and Sherman McKeehee, leads to the conclusion that the taped conversation was simply cumulative in nature. It did not present any evidence which was not otherwise presented by "live" testimony at trial. Furthermore, nothing in the taped conversation contradicted the trial testimony of Appellant Day or Sherman McKeehee and it did not lay any blame on either. Under these circumstances, we conclude that the trial court did not err in finding that no harm had resulted from the juror contact. Thus, we hold that the district court did not abuse its discretion when it denied the appellants' motion for mistrial.

█ There are two broad areas of juror misconduct claims. One involves that of juror bias, the other that of improper juror contacts. Both are at the core of the Sixth Amendment's right to a trial by an impartial jury, free from prejudicial contact. Private communications with a deliberating juror create the concern that the juror may reach a verdict on the basis of the matters communicated, rather than the trial evidence.

*Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed.2d 654 (1954), delineated the standards for determining whether prejudice resulted from improper contacts with jurors. First, the court declared that "any private communication, contact, or tampering, directly or indirectly with a juror during a trial about the matter pending before the jury" is presumptively prejudiced. *Id.* at 229, 74 S.Ct. at 451. In *Remmer,* the case was remanded with instructions that the trial court conduct a post-trial hearing to determine whether prejudice resulted from the improper jury contact which would require a new trial. This hearing should be bent upon determin-

ing the circumstances surrounding the juror contact, the impact it had on the juror, and whether the contact was prejudicial. *Id.* at 229–30, 74 S.Ct. at 451. The court spoke of a strong presumption of prejudice arising from all improper juror contacts, and the heavy burden cast upon the government to rebut the presumption. *Id.* See also *Remmer v. United States,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956); *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *United States v. Hines,* 696 F.2d 722 (10th Cir. 1982); *United States v. Greer,* 620 F.2d 1383 (10th Cir.1980); *United States v. Gigax,* 605 F.2d 507 (10th Cir.1979).

*Remmer* established the evidentiary hearing procedure to determine the issue of prejudice but it did not specifically delineate the process of proof. Beyond the presumption of prejudice, the *Remmer* opinion does not identify the role to be played by the defendant, if any, at a hearing. A defendant must offer sufficient evidence to trigger the presumption of prejudice, *United States v. Greer, supra* at 1385, but it is unclear what quantum of evidence is necessary to overcome the presumption, even though *Remmer* recognized that the juror contact may have been harmless. 347 U.S. at 329, 74 S.Ct. at 451. *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), expands on the proposition that an *ex parte* communication between the trial judge and a juror may be harmless error:

[W]e have previously noted that the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation ... [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips,* 455 U.S. 209, 217 [102 S.Ct. 940, 71 L.Ed.2d 78] (1982). There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded *ex parte* communication between trial judge and juror

can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice (footnote omitted).

464 U.S. at 118–19, 104 S.Ct. at 455–56.

We observe that in *Rushen,* the juror with whom the trial judge had the *ex parte* communications, testified at a post-trial hearing that the incident did not affect her impartiality. The Court observed that a juror may testify concerning any mental bias in matters unrelated to the specific issues that the juror was called upon to decide and whether extraneous prejudicial information was improperly brought to the juror's attention. 464 U.S. at 121, n. 5, 104 S.Ct. at 457, n. 5. In the instant case, as in *Rushen,* there is no dispute concerning the content of the brief restroom conversation between Agent Fender and a juror.

■ The question before us is whether the trial court, armed only with the undisputed content of the conversation, elicited at the hearing, had an adequate basis to find, as a matter of law, that no prejudice resulted. We hold that such is the case. In context, we do not believe that any reasonable person could interpret Agent Fender's remarks to be anything other than a casual, time-of-the-day greeting. First, Agent Fender stated that the juror, whom he did not originally recognize as a juror, made an initial comment to him. Thereupon, Agent Fender responded with the "How are you holding up?" greeting. Unlike the appellants Jones and Bias, we do not believe that the "How are you holding up?" comment implies a concern for the juror. Further, while we agree that it may be "... something you would normally say to a friend who is enduring some type of stressing situation," and something that a coach would say to a player, (Brief of Appellants Jones and Bias, p. 8), it is also something said in the nature of a casual greeting.

In our view, the remarks constitute a common, everyday greeting. That greeting brought a response from the juror that he was sleepy, followed by Agent Fender's last remark to the effect "Well, this may

put you to sleep." The "this" referred, of course, to the tape recording, Government's Exhibit 30. The tape was difficult to hear or understand when amplified. It was not "live" testimony, and it played for approximately thirty minutes. The tape was offered and admitted in evidence as part of the government's case, not that of the defense. Agent Fender's comments about the tape cannot be fairly deemed as directed to the truth of any matters contained on the tape; rather, in context, they were directed to the nature of the recording.

■ Neither the court nor the parties suggested that the juror with whom Agent Fender spoke be called to testify at a *Remmer* hearing. We recognize the reluctance of the courts to permit inquiries into the state of mind of any juror during trial in recognition of rules prohibiting the testimony of a juror about anything influencing the jury verdict. Fed.R.Evid., Rule 606(b), 28 U.S.C.A.; *Hyde v. United,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); *Holden v. Porter,* 405 F.2d 878 (10th Cir.1969). The purpose behind Rule 606(b) is to insure that jurors will decide cases only on the basis of the evidence admitted. The *Remmer* hearing held in the instant case, however, occurred during the trial and before the jury had retired for deliberations upon the verdict. Thus, Rule 606(a) applied. This rule disqualifies a juror from giving testimony in the trial of the case before a jury on which he sits. It does not, however, prevent a juror from testifying in a *Remmer* type hearing during trial relative to extraneous matters such as pretrial publicity or contacts with parties or outsiders and the effect thereof. *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *United States v. Miller,* 806 F.2d 223 (10th Cir.1986).

In *United States v. Sutton,* 732 F.2d 1483, 1494 (10th Cir.1984), *cert. denied,* 469 U.S. 1157, 105 S.Ct. 903, 83 L.Ed.2d 919 (1985), we upheld the trial court's denial of a motion for a new trial after a juror testified about her maid's report of extra-

neous phone calls when a voice whispered "Sutton, Sutton" and that it had not affected her deliberations. *See also United States v. Robinson,* 645 F.2d 616 (8th Cir.), *cert. denied,* 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). It is one thing to prohibit a juror from testifying directly about the effect of outside contacts on jury deliberations leading to a verdict, 3 Louisell & Mueller, *Federal Evidence,* §§ 286–287 (1979), *Owen v. Duckworth,* 727 F.2d 643 (7th Cir.1984), *Wiedemann v. Galiano,* 722 F.2d 335 (7th Cir.1983), *United States v. Greer,* 620 F.2d 1383 (10th Cir.1980), and entirely another to permit a juror to appear at a pre-verdict *Remmer* hearing and to give testimony relative to what an improper contact statement meant or imparted to the juror and whether the statement affected his or her impartiality. In this case, the juror could have been called and inquired of what Agent Fender's remark "Well, this may put you to sleep" meant or imparted to the juror, and whether the remark affected his impartiality. *See* Annot., 58 A.L. R.2d 556, 573, § 7[a].

The Supreme Court has held that a trial court can rely upon its self-evaluations of alleged biased jurors in determining actual juror bias. *Smith v. Phillips,* 455 U.S. 209, 217 n. 7, 102 S.Ct. 940, 946 n. 7, 71 L.Ed.2d 78 (1982), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984). So, too, did the trial court in the case at bar rely upon its self-evaluation of the effect of Agent Fender's comments on the juror. Thus, the testimony given by Agent Fender, uncontradicted by the defendants, did overcome the presumption of prejudice. In our view, it was then the burden of the defendants-appellants to present evidence demonstrating actual prejudice. This they failed to do.

Appellants insist that *United States v. Hines, supra,* supports their contention that the burden did not shift to them because the government did not satisfy threshold requirements eliminating the presumption of prejudice. Appellants contend that *Hines* posed three questions: (A) Who initiated the private conversation? Appellants state that although Agent Fender did not recall who started the conversation, he did admit making the statement "How are you holding up?" (Brief of Appellants Jones and Bias, p. 7). They contend that this was not a responsive question; rather, it was an opening remark; (B) Were the merits of the case or the evidence discussed? Appellants argue that the opening statement by Agent Fender was not a greeting when considered in relation to his next (and last) statement that the next piece of evidence (the tape) will put you to sleep, clearly indicating that the statements made on the tape recording by Appellant Day were lies; and (C) How long was the conversation? Appellants state that although the conversation was brief, this does not dispel its content, i.e., that the tape recording was boring because it contained lies told by Appellant Day. After the trial court questioned Agent Fender regarding the juror contact, the court observed that it did not think there had been any harm; however, the court inquired whether the parties wished to make any record (R., Vol. V, p. 447). In response, the appellants moved for mistrial on the basis that the record was made. *Id.* at 448. In our view, the presumption of prejudice was overcome by reason of Agent Fender's testimony. The appellants offered no rebuttal evidence. The appellants elected to rest their case on the apparent proposition that Agent Fender's testimony relative to his conversation with the juror did not overcome the presumption of prejudice.

In *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984), the Supreme Court pertinently observed:

This Court has long held that "[a litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials." (Citations omitted). Trials are costly, not only for the parties but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing case load. Even

this straightforward products liability suit extended over a three-week period.

We have also come a long way from the time when trial error was presumed prejudicial and reviewing courts were considered "citadels of technicality." *Kotteakos v. United States*, 328 U.S. 750, 759 [66 S.Ct. 1239, 1245, 90 L.Ed. 1557] (1946). . . . The harmless error rules adopted by this court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for "error" and ignore errors that do not affect the essential fairness of the trial.

■ In the case at bar, the trial court did conduct a *Remmer* hearing, inviting the parties to make a record. The court questioned Agent Fender and the parties agree that his account of his brief restroom conversation with a juror was accurate. The trial court determined that, based on Agent Fender's testimony, no harm or prejudice had resulted. The defendants were free to call the juror or otherwise present evidence to establish prejudice in fact. This they did not do. Instead, they relied then, as they rely now, on the proposition that the testimony of Agent Fender established prejudice to the appellants in that Agent Fender related to the juror that Appellant Day's statements on the tape recording were lies. We do not accept this reasoning. We cannot discern any genuine possibility of prejudice to the appellants at the trial on the substantive counts resulting from the remarks made by Agent Fender to the juror. In any event, following Agent Fender's testimony relative to the juror contact, it was the obligation of the appellants to establish such prejudice in fact. The trial court offered the appellants the opportunity of a full evidentiary hearing on the issue of prejudice. They declined to accept the offer.

The trial judge, following the *Remmer* type hearing, analyzed and characterized the seriousness of Agent Fender's improper contact with the juror. This analysis was undertaken, guided by the presumption of prejudice. The court, after determining that there was no dispute about the nature of the conversation, found that no actual prejudice had occurred. The trial court's decision as to how to proceed in response to allegations of juror misconduct or bias will not be reversed except for abuse of discretion. *United States v. Bradshaw*, 787 F.2d 1385 (10th Cir.1986); *United States v. Behrens*, 689 F.2d 154 (10th Cir.), *cert. denied, sub nom., Wilkett v. United States*, 459 U.S. 1088, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982). "Whether a motion for mistrial should be granted is within the discretion of the trial judge because he is in the best position to evaluate the effect of the offending evidence on the jury." *United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir.1980).

In *United States v. Hines, supra,* we dealt with a problem similar to that presented in the instant case. During the *Hines* trial, the judge and counsel retired to the judge's chambers to consult, leaving a witness in the witness box. During their absence, the witness, an FBI agent, spoke from the witness box to two jurors. The conversation was reported to the court and counsel. In the absence of the jury, the court granted the appellants a hearing on the contact. The FBI agent testified that the conversation involved qualifications for becoming an FBI agent; but did not involve the merits of the case. The FBI agent did not initiate the conversation and it lasted only about two minutes. The jurors were not called. The trial judge denied the appellants' motion for mistrial. This court held:

We have examined carefully the record on this matter and have concluded that it rebuts any presumption of prejudice. *See Bacino v. United States*, 316 F.2d 11, 14 (10th Cir.), *cert. denied*, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963). A careful consideration of appellants' arguments to the contrary does not dissuade us from this view. The communication was improper, and it is unfortunate that it occurred. However, appellants were not prejudiced by it, and the court acted properly in denying their motion for a mistrial when, after a proper hearing,

the harmlessness of the communication was made to appear.

696 F.2d at 731.

WE AFFIRM.